1  Josh D. Gruenberg, Esq. SB #163281
2  Colette N. Mahon, Esq. SB #304745
   GRUENBERG LAW
   2155 FIRST AVENUE
3  SAN DIEGO, CALIFORNIA 92101
   TELEPHONE: (619) 230-1234
4  TELECOPIER: (619) 230-1074

5  Attorneys for Plaintiff,
   **GREGORY ARNOLD**

6

7

8                    **UNITED STATES DISTRICT COURT**

9               **SOUTHERN DISTRICT OF CALIFORNIA**

10  GREGORY ARNOLD, an individual,   Case No.    **'20 CV 0809 BEN RBB**

11                  Plaintiff,        **PLAINTIFF'S COMPLAINT FOR:**

12  v.

13  CORECIVIC OF TENNESSEE LLC;      1. WRONGFUL CONSTRUCTIVE
    and DOES 1 through 25, Inclusive,    TERMINATION IN VIOLATION
14                                        OF PUBLIC POLICY [Cal. Labor
                                          Code §§ 6400 *et seq.*, 6401 *et*
15                  Defendants.           *seq.*]];
                                       2. WRONGFUL CONSTRUCTIVE
16                                        TERMINATION IN VIOLATION
                                          OF PUBLIC POLICY [Cal. Code
17                                        Regs. Tit. 8, §§ 5141, 3380];
18                                     3. WRONGFUL CONSTRUCTIVE
                                          TERMINATION IN VIOLATION
19                                        OF PUBLIC POLICY [29 USC
20                                        654(a)(1)];
                                       4. WRONGFUL CONSTRUCTIVE
21                                        TERMINATION IN VIOLATION
22                                        OF PUBLIC POLICY [29 C.F.R.
                                          §§ 1910.132];
23                                     5. NEGLIGENT SUPERVISION;
24                                     6. INTENTIONAL INFLICTION OF
                                          EMOTIONAL DISTRESS.
25
26                                        **[JURY TRIAL DEMANDED]**
27

28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

COMES NOW THE PLAINTIFF, alleging against Defendants as follows:

**GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

1.  Plaintiff, GREGORY ARNOLD, (hereinafter "Plaintiff" or "ARNOLD"), is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California, County of San Diego.

2.  Plaintiff is informed and believes and thereon alleges that Defendant, CORECIVIC OF TENNESSEE LLC (hereinafter "CORECIVIC") is an unknown business entity doing business in the State of California, County of San Diego with its headquarters and principal place of business in Tennessee.

3.  Pursuant to 28 U.S.C. Section 1391(b)(2), the proper venue for this action is in the Southern District of California, as a substantial part of the events or omissions giving rise to the claims against each defendant occurred in San Diego, California.

4.  The matter in controversy exceeds the sum of $75,000.00.

5.  As a matter in controversy exceeds the sum of $75,000, and the Plaintiff and the Defendants are diverse as set forth in 28 U.S.C. Section 1332(a)(1), this Honorable Court has diversity jurisdiction with respect to this action.

6.  Plaintiff is ignorant to the true names and capacities of the Defendants sued herein as DOES 1 through 25 and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

7.  Plaintiff is informed and believes and thereon alleges that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendant.

8.  Plaintiff is informed and believes and thereon alleges that the

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendant, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendant.

9. As a further proximate result of Defendants' unlawful and intentional actions, and each of their agents, against Plaintiff as alleged herein, Plaintiff has been harmed in that he suffered emotional pain, mental anguish, loss of enjoyment of life, and emotional distress.

10. Defendants committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amount to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

11. Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

12. Plaintiff seeks compensatory damages, punitive damages, costs of suit herein, and attorney's fees.

13. Furthermore, Plaintiff alleges that the acts complained of herein took place within the above captioned judicial district.

## SPECIFIC FACTUAL ALLEGATIONS

14. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

**I.    The Parties**

15. Defendant, CORECIVIC, formerly known as Corrections Corporation of America, hired Plaintiff in or around November 2018, in the capacity of Detention Officer at Otay Mesa Detention Center.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

16.  Defendant is a private operator of correctional facilities with contracts for services with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Marshals Service ("USMS").

17.  Otay Mesa Detention Center is a contract detention facility (CDF). It is a privately owned immigration detention center, owned and operated by Defendant and located in San Diego, California.

**II.      Plaintiff's Career with Defendant**

18.  Throughout Plaintiff's employment, there have been numerous incidents of Defendant failing to maintain a safe work environment. It became evident to Plaintiff that what his co-workers expressed to him on many occasions, that Defendant only cared about profits, was true. Over and over, Defendant placed profits over safety.

19.  As a Detention Officer, Plaintiff worked in a number of different units and posts, including, housing units (otherwise referred to as pods), dining hall (otherwise referred to as the chow hall), medical units, pod recreation post, gymnasium, breaking officer, Visitation, armed perimeter detail, armed transport, and the hospital detail.

20.  Otay Mesa Detention Center houses approximately between 1200 to 1300 detainees and inmates. There are approximately 22 housing units, including medical and mental housing units.

21.  During Plaintiff's employment with Defendant, there were approximately 128 persons per housing units with one officer on duty in the pod. Many pods were at full capacity of 128 persons. Many times housing units were filled with 142 persons, which required extra beds. On at least one occasion, there was approximately 170 persons. Only when capacity reaches 160 persons is an additional officer assigned to work in that housing unit.

22.  Throughout Plaintiff's employment, Defendant had a continuous shortage of staff, including both Detention Officers and Supervisors. This made it

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

extremely difficult for Detention Officers to reach a Supervisor when a problem arises. This placed Defendant's Detention Officers in unsafe situations when an issue came up that the Detention Officer could not handle on his or her own.

23. For example, in or around summer of 2019, Plaintiff was working in a high level USMS housing unit, M-Pod, which included inmates with numerous gang affiliations. On one evening, around 8:30 p.m., the facility's heater turned on and it was sweltering in the housing unit Plaintiff was working. The extreme heat caused the inmates to strip down to their underwear and profusely sweat. Plaintiff was also sweating profusely. Some inmates informed Plaintiff that they were concerned because they had heart conditions and high blood pressure. Plaintiff emailed Defendant's Maintenance Supervisor Lake. The Maintenance Supervisor Lake replied the next evening and informed Plaintiff that he fixed the problem. Yet, later that second evening the heaters were back on again. The inmates complained again and it was extremely hot. It felt like it was approximately 85 degrees or more inside of the cells. Plaintiff again emailed the Maintenance Supervisor Lake. The next day, once again, the heater turned on. Plaintiff contacted the on-duty Supervisor, who told Plaintiff to email Maintenance again. On the third evening, Plaintiff sent the same message and received the same reply the fourth evening, that Lake fixed the problem. Yet again, on the fourth evening, the heaters came on again. Defendant created an unsafe work environment for Plaintiff. The inmates had enough and their designated lead gang member ("shot caller") approached Plaintiff with four of his "soldiers" and said, "Arnold, no disrespect to you, but we want to talk to the Captain. If this heat turns on again, we're not going to lock down." He had previously informed Plaintiff that he had been part of a "prison riot" that had occurred the previous year. Plaintiff called the Supervisor's office

multiple times to get help. Finally, Lieutenant Blossom and Captain Rodwell told Plaintiff they would come to the housing unit to talk with the inmates. Hours later, Lieutenant Blossom and Captain Rodwell still had not arrived and the gang members were increasingly distraught. The designated lead gang member had approached Plaintiff multiple times. There was significant tension and Plaintiff was getting extremely uncomfortable and fearful he might be taken hostage. At the 10:00 p.m. count time, Plaintiff asked the over 100 inmates to lock down in their cells, but they refused and were livid. Plaintiff felt he was in extreme danger. Finally, the Captain showed up and assured the inmates the heater would be fixed the next morning. On information and belief, Defendant lacked sufficient staff to properly respond to the incident and correct the situation. Defendant placed profits over the safety of its employees and the inmates.

24.   Throughout Plaintiff's employment, there has also been an extensive amount of mandatory overtime, which puts Detention Officers' safety at risk due to significant fatigue.

25.   The high capacity of inmates/detainees that Plaintiff was responsible for in the housing units he was assigned to throughout his employment made it extremely dangerous for Plaintiff and impossible to keep track of all of the inmates/detainees, at times up to 142. While ensuring the safety and security of all inmates/detainees, Plaintiff had numerous other responsibilities, including but not limited to: conducting safety and security checks every thirty minutes, conducting there cell searches per shift, check fire extinguishers, ensure phones and computers in the satellite law library are in good working order, take inventory, send inmates/detainees to the dining hall/medical/visitation/library, and much more.

26.   On many occasions, Plaintiff was assigned to work in the dining hall, which is compromised of the east and west dining halls. This held between

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

approximately 100 to 300 detainees/inmates at once. Many times, there were 300 detainees/inmates at once. Defendant assigns only three Detention Officers to work in each dining hall. On occasions, Plaintiff and only one other Detention Officer was assigned to the dining hall and the only way to remove yourself is by pushing a button by the door and wait for Central Control to open the door. Once again, Defendant placed profits over the safety of its employees and the inmates/detainees by not ensuring adequate staff supervision.

27.   Defendant does not ensure proper training for its employees. Training in the Academy for approximately six weeks prior to working in the facility focuses on self-defense and correctional techniques.  Any on-the-job training for the housing units is only for a couple of days where the Detention Officer shadows the housing unit officer. There is no requirement to demonstrate your competence to work on your own.

28.   Other than a couple of days of on-the-job training for working in the housing units, there is no other on-the-job training for many of the other units Plaintiff worked, including, but not limited to, the dining hall, being a video recreation officer, working in the gymnasium, working in the corridor to direct traffic of inmate/detainees and other persons. There is also only one day of formal training in the Academy for doing cell extractions, which could be potentially dangerous.

29.   On information and belief, multiple Detention Officers coming from the Academy did not receive any training on strip searches, which are conducted to protect other detainees/inmates and other persons working in the facility.

30.   Plaintiff also began training new officers within only a few months of his employment. This was a common practice. Detention Officers with very little experience train new officers.

31.   When Plaintiff raised his concerns with his coworkers about the lack of

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

training, they would reply, "That's the CCA [Corrections Corporation of America] way."

32. Detention Officers are not properly trained on how to work with inmates/detainees with psychiatric issues. On multiple occasions, Detention Officers assist medical personnel with opening doors and helping to transfer psychiatric patients, who many times return to the housing units. On at least one occasion, a Detention Officer was attacked by a psychiatric patient.

33. Many detainees arrive from all over the world.

34. Throughout Plaintiff's employment, there have been numerous incidents of detainees or inmates that arrived with measles or mumps, requiring entire housing units to be cohorted or quarantined. On multiple occasions, new detainees or inmates were assigned to and resided in a housing unit for one or two days before receiving a chest x-ray for tuberculosis. Some of these detainees/inmates have tested positive. There have been cases of detainees/inmates arriving with scabies and MRSA. There have also been many cold and flu outbreaks during the time Plaintiff was employed with Defendant. During Plaintiff's employment, there was also a lice outbreak in a female housing unit. Kitchen workers from the female housing unit were permitted to continue working in the kitchen and on Plaintiff's information and belief, the female housing unit was also permitted to eat in the dining hall.

35. Defendant does not train Detention Officers on how to handle these infectious diseases, yet they are on the front lines of interacting with potentially infected persons. Plaintiff handled a detainee with active tuberculosis and had to ask the respiratory therapist how to do so safely.

36. Detention Officers are also not trained on how to handle biohazards such as feces and blood spills, yet they are responsible for cleaning feces and blood spills. There is a blood spill kit in each pod, but the Detention Officers are

not trained on how to use it.

37. Inmates/Detainees are responsible for cleaning the facility, yet many are from third world countries and are not trained on how to properly clean. On information and belief, the efficacy of the cleaner is dependent on leaving the cleaner on a surface for ten minutes. Sinks and showers are shared among dozens of detainees/inmates without disinfection between each use. Detainees are not consistently given gloves, even when they are required to clean the unit with used rags. Oftentimes the cleaner runs low in the housing units and the "porters" (cleaning crew) do not have what they need to properly sanitize the housing units.

38. On one occasion, on March 31, 2020, Defendant assembled a team to extract an inmate who was flooding his cell. The team consisted of five officers, mostly newer employees and Plaintiff was assigned to videotape. When Plaintiff and the team arrived, they opened the door and Plaintiff saw blood on the inmate's hands, face, and pooling underneath the inmate. One officer said the blood was coming from his neck. The Lieutenant called the Medical Unit to respond. One officer said, "I don't think he's going to make it sir," or words to that effect. The officer had no training or protocol for this incident. Defendant does not train its Detention Officers on how to respond to medical emergencies prior to the Medical Unit arriving and there is no way to radio Medical so the officer could be directed on how to respond prior to their arrival. Plaintiff asked the Sergeant Mileto if there were any towels to put direct pressure on the wound. There were not. The Medical Unit arrived approximately five minutes later.

39. On one occasion, a detainee had Methicillin-resistant Staphylococcus aureus ("MRSA"), a contagious staph infection that can be spread from person to person. Plaintiff was posted for one of the days the detainee was in the medical unit. Plaintiff, nor the other Detention Officers, were properly

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

trained on how to handle the detainees with this infectious disease.

40.   During the first month of Plaintiff's employment, there was a large shortage of sanitation supplies. There was very little soap or shampoo. Toilet paper was rationed in the housing units. On numerous occasions, Plaintiff broke bars of soap in half to provide to detainees. There were many days were housing units were completely out of soap, shampoo, or toilet paper. There was also a large shortage of paper towels and antibacterial hand sanitizer.

41.   Defendant repeatedly placed inmate/detainee and Detention Officers' safety over profits.

42.   In another example, despite multiple incidents of detainees falling off of their top bunks, it was not until a detainee suffered a fatal fall that Defendant installed barriers bolted on the top bunks. Defendant does not act until it is too late.

43.   In yet another example, in early 2020, Plaintiff was working as the Recreation and Breaking Detention Officer in the L-Pod housing unit, a high-level ICE housing unit, which houses former prison inmates, gang members and many with mental health problems. Plaintiff learned that a high-level detainee, who Plaintiff had previously guarded in the mental health unit, was removed from G-Pod and placed in L-Pod because he was urinating into a cup, placing it in the communal microwave, and drinking it. The detainees in G-Pod were being hostile towards him because of this conduct. Yet, many of the residents from G-Pod were later moved to L-Pod. Defendant had placed the detainee with the same detainees who were previously hostile towards him. While Plaintiff was in L-Pod, many of the detainees approached him and complained about the detainee and his practice of microwaving his urine. When the detainee passed Plaintiff, he could smell the urine about his person. Plaintiff also saw him carrying a bottle which appeared to have urine in it. This was, to say the least,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

extremely unsanitary and unsafe for the detainees and Defendant's staff. One detainee showed Plaintiff his binder full of complaints to Defendant, including Warden LaRose, and ICE about the unsanitary detainee and his conduct, but nothing had been done. Because of Defendant's failure to act, the detainees were extremely upset and wanted to hurt the unsanitary detainee, creating an additional unsafe environment for Plaintiff. The L-Pod's Detention Officer spoke to Captain Niecko about the situation. Captain Niecko explained that if one of the detainees came up to the unsanitary detainee and threatened him, then he could put the detainee(s) in segregation and would be able to remove the unsanitary detainee from the housing unit. On information and belief, sometime thereafter, another complaint was lodged by a detainee because Warden LaRose was doing rounds in L-Pod and walked completely around the unsanitary detainee's cell. The unsanitary detainee was thereafter removed.

44.   Defendant placed profits of the safety of its staff and the inmates/detainees. If a detainee is deemed to be a danger to himself or others, or has to go to the hospital to be evaluated, additional Detention Officers are required to guard the detainee and for possibly longer shifts, which, of course, increases costs.

## III.   COVID-19 Is A Communicable Disease That Can Cause Serious Illness or Death

45.   On March 11, 2020, the World Health Organization declared the global outbreak of COVID-19, the disease caused by the novel coronavirus, a pandemic.

46.   It is well established that COVID-19 is easily transmitted, especially in group settings, and that the disease can be extremely serious, causing serious illness and death.

47.   There is no effective treatment or cure yet for the disease and everyone is at risk of infection.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

48. The CDD explained that COVID-19 appears to spread easily and sustainably within communities and is thought to transfer primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes and may transfer through contact with surfaces or objects contaminated with these droplets. There is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms.

49. According to the CDC, older adults and people who are immunocompromised, have severe chronic medical conditions like heart, lung or kidney disease, moderate to severe asthma, severe obesity, diabetes, or other serious underlying medical conditions are also at higher risk for more serious COVID-19 illness. Early data suggested older people are twice as likely to have serious COVID-19 illness.

50. The CDC has also identified people with moderate to severe asthma may be at a higher risk for severe illness from COVID-19, including pneumonia and acute respiratory disease.

51. Individuals who survive may experience permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications.

**III.    Defendant Is At Higher Risk For Transmission Of COVID-19**

52. California/OSHA identified facilities that house inmates or detainees as being at increased risk for transmission of aerosol transmissible diseases. (CCR, title 8, section 5199). COVID-19, a novel pathogen, is such a disease.

53. At Otay Detention Center, the risk of spread was apparent and has already occurred.

54. Employees of Otay Detention Center worked in close proximity to one another and inmates and detainees who were maintained in very close quarters.

55. Taking steps to prevent the COVID-19 from entering and spreading

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

throughout the facility was of the utmost importance in this type of working environment.

56.   As of April 27, 2020, approximately 142 inmates/detainees and numerous employees and their families have contracted COVID-19.

**III.   Plaintiff Is At Higher Risk For More Serious Illness From COVID-19 And Resides With Family At Higher Risk**

**57.**   Plaintiff is a sixty-year old male who takes Lisinopril for high blood pressure and resides with family members who are also at higher risk for more serious illness from COVID-19.

**IIII.   Defendant Failed To Take Proper Precautions To Prevent The Spread of COVID-19**

58.   In or around March 2020, COVID-19 cases across the United States and in San Diego County rapidly increased. On March 12, 2020, the CDC reported 1,215 cases with 36 deaths. By March 17, 2020, the CDC reported 1,626 cases with 75 deaths. By March 30, the CDC reported 140,940 cases with 2,405 deaths. Approximately one month later, on April 28, 2020, the CDC reported 981,246 cases with 55,258 deaths. On March 13, 2020, San Diego County reported 5 cases, and by March 23, there were 213 cases and no reported deaths. Approximately one month later, on April 27, 2020, San Diego reported 3,141 cases and 113 deaths.

59.   Even the threat of spread of COVID-19 outside of the detention center was so apparent that many government officials issued "shelter in place" orders and social distancing mandates, which requires persons to stay at least six feet distance apart from each other.

60.   By March 17, 2020, the City and County of San Francisco, along with a group of five other Bay Area counties and the City of Berkeley, issued shelter in place limitations across the Bay Area, requiring everyone to stay safe at home except for certain essential needs.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

61.   Two days later, on March 19, 2020, the State of California issued a state-wide "shelter in place" order requiring people to stay at home except for essential activities and to maintain social distancing to the maximum extent possible.

62.   During the weeks leading up to Plaintiff's constructive termination, Defendant was aware of the grave nature of COVID-19 and its rapid transmission.

63.   During the weeks leading up to Plaintiff's constructive termination, Defendant was repeatedly advised by numerous sources to take measures to prevent the spread of COVID-19 in its facility.

64.   During the weeks leading up to Plaintiff's constructive termination, Defendant failed to adequately respond to the COVID-19 pandemic.

65.   On March 12, 2020, Defendant posted on its website, "Consistent with CDC recommendations, personal protective equipment (PPE) such as face masks are allowed to be worn by staff and those in our care within the facility. Disposable gloves are readily available for staff conducting searches and handling property. Staff working at the front lobby screening site wear PPE." This was false.

66.   Defendant expressly prohibited Plaintiff and other employees of Defendant from wearing masks and masks were not provided to the entire staff, including those directly guarding suspected COVID-19 patients.

67.   Throughout Plaintiff's employment, Detention Officers were rarely able to find gloves and many times too small.

68.   Even Detention Officers who were responsible for patting down detainees when necessary were also not provided with gloves or masks.

69.   Defendant did not provide sanitizer to staff. There were sanitizer dispensers in only certain areas of the facility, but throughout Plaintiff's career with Defendant, it was usually empty.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

70.   In addition to the restrooms, the dining hall tables and kitchen were periodically cleaned by the detainees/inmates. On information and belief, the detainees/inmates did not have proper instruction how to use the cleaner so that it was effective. On information and belief, the efficacy of the cleaner is dependent on leaving the cleaner on a surface for ten minutes.

71.   Additionally, when Plaintiff worked in the housing units, detainees often complained that the soap dispensers were empty and he could not find refills.

72.   Additionally, the inmates/detainees used the same rags to clean throughout the day, including in the medical unit. Even in the midst of the COVID-19 pandemic, Defendant did not provide paper towels instead of dirty rags.

73.   Defendant also did not provide any cleaning sanitizer or disinfectant wipes to staff, so staff could keep their things and work areas clean.

74.   Each morning, Plaintiff, along with his coworkers, was required to clock in and out through the same device, by placing a finger on the device or punching in times multiple times throughout the day. At the end of the day, Plaintiff and his coworkers were required to answer a series of questions on the device by punching the buttons. The device was never regularly cleaned. Even in the midst of the COVID-19 pandemic, Plaintiff did not observe the device ever being cleaned.

75.   On information and belief, in or around April 2020, Defendant started to permit staff to swipe a card to punch in and out, but crowding to punch in (with 30 to 40 people waiting in a line in a narrow hall) prevented proper social distancing. Defendant did not permit officers to submit missed punch cards instead, which were readily available, so as to ensure proper social distancing.

76.   On information and belief, the kiosk machine that Plaintiff and his coworkers were also required to touch in order to obtain and return keys for

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

the different departments they were working in at the start and end of their shifts was also never regularly cleaned. Neither were the keys that were used by different Detention Officers each day.

77. Additionally, upon their arrival to work, Plaintiff, along with many of his coworkers, were required to obtain their equipment, such as a handheld radio, handcuffs, and pepper spray from Central Control. Prior to and during the weeks leading up to Plaintiff's constructive termination, these items were not regularly cleaned. During Plaintiff's employment, he never observed the employee(s) in charge of handing out equipment to other officers wear a glove or mask while carrying out these duties, even in the midst of the COVID-19 pandemic.

78. In addition, on information and belief, the grey bins that staff and visitors place items in, such as shoes, lunch, jackets, purses, and backpacks, and which are placed through a metal detector by either staff or visitors in the main lobby entrance, were not disinfected.

79. On Plaintiff's information and belief, there were never any deep cleanses of the facility, even in the midst of the COVID-19 pandemic.

80. Prior to and during the weeks leading up to Plaintiff's constructive termination, Defendant continued to feed inmates/detainees in the dining hall, which contained approximately two housing units at once, typically approximately 240 persons at once.

81. Through approximately March 30, 2020, Defendant also continued to hold and require employees to attend morning briefing sessions. These briefing session were held in a break room with approximately thirty to forty people at once.

82. When Defendant did begin to take steps to prevent transmission, it was not adequate.

83. When Plaintiff logged into his computer, he was presented with basic

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1    information, such as washing his hands for twenty seconds, covering his

2    mouth if he coughed, practicing social distancing and staying home if he was

3    sick. Defendant did not provide any protocols or directions related to

4    decreasing the risk of transmission in its facility, directions on how to

5    practice social distancing in the facility, or implement any steps to properly

6    disinfect and clean or provide protective gear in response to the COVID-19

7    pandemic.

8    84.   In or around March 2020, Defendant, through Assistant Warden ("AW"),

9    Joe Roemmich ("Roemmich"), directed all detention officers that were

10   assigned to the Transport Department and Intake/Discharge Officers, to take

11   temperatures of inmates/detainees leaving the facility. Defendant directed

12   that any inmate/detainee with a temperature over 100.4 was required to

13   return to their unit. The Medical Unit was between the inmates/detainees

14   housing units and the Intake/Discharge unit, so any potential case of

15   COVID-19 was required to pass the Medical Unit, exposing the entire area

16   between their housing unit and the Intake/Discharge Unit. Defendant did not

17   take reasonable steps to prevent the spread of COVID-19 by reducing

18   potentially exposed areas within the facility. Furthermore, returning an

19   inmate/detainee with a temperature over 100.4 would potentially expose

20   their housing unit to an increased risk of contracting COVID-19. In addition,

21   Defendant required its non-medical personnel employees to obtain

22   inmate/detainee temperatures while medical personnel with proper training

23   and equipment were readily available.

24   85.   Defendant did not take temperatures of persons before they entered the

25   facility or otherwise triage them to determine if they were experiencing any

26   COVID-19 related symptoms until approximately on or about the last week

27   of March 2020.

28   86.   When Defendant did begin taking temperatures, it did so in the enclosed

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

small lobby of the facility. Defendant was readily able to take temperatures outside of the facility to ensure persons with a temperature did not actually enter into the building, increasing the risk of transmission.

87.   It was all too little too late.

88.   On the morning of March 17, 2020, Warden Christopher LaRose and Assistant Warden ("AW") Robert Garcia ("Garcia") were present at the morning briefing session. Detention Officer Trick asked the wardens if they were going to provide them with sanitizer or disinfectant wipes to keep their things and working areas clean. Warden LaRose replied they had a budget for that and would be getting it soon. On information and belief, these were not provided as promised. In the briefing meeting, Detention Officer Castrejom asked the wardens if they were going to get clean rags for her "porters" (cleaning crew) because they were having a hard time getting clean rags and were re-using the same rags throughout the day. Warden LaRose replied, "that chemical [in the cleaner] will kill anything, any virus," or words to that effect. Officer Castrejom tried to push back and replied, "Fine, but we are using dirty rags," or words to that effect. Warden LaRose replied they would get them clean rags. Clean rags were never supplied and the porters continued to use dirty rags to clean the facility. Warden LaRose's parting words were, "look guys, when or if we get it, we're all going to eventually get it," or words to that effect.

89.   On or about March 30, 2020, Plaintiff was working in Paradise Valley hospital, guarding a detainee with Tuberculosis. Plaintiff wore an N95 mask and gloves while attending to him in a negative pressure room and assisted with taking his restraints on and off as necessary when he would use the restroom or a nurse would have to take his vitals. Plaintiff had obtained the N95 mask from Defendant earlier in his employment when he was assigned to work in a medical unit to guard detainees/inmates. Plaintiff obtained the

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

gloves from the hospital. At this time, Plaintiff also guarded another detainee in a negative pressure room who had a cough and fever, and was being tested for COVID-19.

90.   When the hospital breaking Detention Officer Villanueva came to provide a break for Plaintiff, he informed Plaintiff that he asked Captain Niecko if Defendant could provide him an N95 mask. Villanueva was directly working with a suspected COVID-19 patient. Captain Niecko denied Villanueva's request.

91.   On March 30, 2020, ICE Health Service Corps (IHSC) sent a letter to Defendant's staff, including Plaintiff, and ICE leadership. It notified them that on March 29, 2020, three detainees presented to medical with complaints of unspecified lower respiratory illness symptoms. It notified them that IHSC leadership and Core Civic staff made the following recommendations: To implement cohorting (housing together as a group) the unit that housed the three symptomatic detainees and restrict movement for 14 days. There was no way to ensure social distancing. There was only one door in and out of the unit and each room within the units had the capacity to hold eight detainees with bunk beds. The recommendations also permitted exposed detainees to participate in recreational activities and did not require detainees to wear a surgical mask while doing so.

92.   The letter provided few additional recommendations. Each falls short of providing Plaintiff and his coworkers with a safe working environment.

93.   On March 31, 2020, Plaintiff was assigned to work in the detention facility as the breaking officer. Plaintiff arrived wearing an N95 mask and gloves in an attempt to protect himself from the looming outbreak of COVID-19.

94.   On March 31, 2020, Plaintiff reviewed an email from Warden LaRose that was sent the evening prior. Warden LaRose informed Plaintiff and his colleagues that one of Defendant's employees had been confirmed positive

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1    with COVID-19. Plaintiff replied to Warden LaRose and suggested that all

2    facility staff should wear gloves and masks, which was recommended by Dr.

3    Fauci, President Donald Trump's medical advisor. Plaintiff explained that

4    Rikers Island went from one confirmed case of COVID-19 to 200 cases

5    within twelve days. Warden LaRose vaguely replied that the facility's

6    governing bodies' protocols and guidelines were being followed and he

7    should continue social distancing and washing his hands.

8    95.   On information and belief, the employee who confirmed positive with

9    COVID-19 had been out of work for 10 days, yet the first mention of this

10   situation by Defendant was 10 days later when they confirmed positive with

11   COVID-19.

12   96.   Later that day, Plaintiff observed a detainee walking around his housing unit

13   with flu-like symptoms. The Detention Officer in charge of the housing unit

14   was upset because he had repeatedly called the Medical Unit for help

15   because he could be infecting everyone, and had been waiting for hours with

16   no response. The Officer expressed that he lived with elderly persons at

17   home and was the sole source of income for his family.

18   97.   Unfortunately, waiting on the Medical Unit was a common occurrence.

19   There were occasions where the Medical Unit was not responding so the

20   Detention Officer had to call a Supervisor because the inmate/detainee was

21   having a terrible time.

22   98.   Plaintiff was thanked by numerous USMS inmates and ICE detainees for

23   wearing the protective equipment for their safety. One of the detainees said,

24   "God bless you for wearing the mask." All of the inmates/detainees have

25   televisions in their housing units and are able to wash the various news

26   networks, CNN, Fox and Spanish television, so they understood the

27   seriousness of COVID-19.

28   99.   The next day, on or about April 1, 2020, Plaintiff returned to work at

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

approximately 3:00 p.m. While standing near the time clocks, Plaintiff heard Captain Feran, Plaintiff's supervisor, inform a female Detention Officer Mendoza and a male Detention Officer Sayers that they could not wear protective masks in the housing units. Officer Mendoza protested and said "this is ridiculous. There is not even disinfecting in the housing units," or words to that effect. Captain Feran then told Plaintiff he could no wear his mask in the housing units.  Plaintiff informed Captain Feran that he was more susceptible to COVID-19 because hew as a 60-year old male and lived with his son who suffered from asthma.  Plaintiff told Captain Feran he did not want to bring COVID-19 home to his family.

100.  Captain Feran then brought Officer Mendoza and Plaintiff to Warden LaRose's office, where AW Roemmich was already present. Captain Feran explained their concerns and AW Roemmich replied that he did not even know the effectiveness of the masks that they were wearing for their protection or the protection of the inmate/detainee population because they could have been purchased from Walmart. Plaintiff repeated his concerns. Warden LaRose informed Plaintiff that a second staff member had become infected with COVID-19 and that they were following protocols.

101.  Other than discontinuing morning briefings and encouraging people to wash and "social distance," Plaintiff never saw or learned what "protocols" were being implemented, other than temperatures taken inside of the facility rather than at the gate outside and one sanitizer dispenser placed in between the time clock device. Plaintiff never saw or learned how Defendant was ensuring social distancing was even possible. Defendant was filled with so many inmates/detainees that social distancing  was not possible and nothing was implemented to attempt social distancing.

102.  Most of the housing units were in excess of 100 persons. The bunk beds are no more than four or five feet away from one another. Because of the high

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

volume of detainees/inmates, it is not possible for them to line up six feet apart in order to receive their meals or wait in line as staff move them between different areas of the facility, which includes the Detention Officers who are on guard.

103. Warden LaRose told Plaintiff that he did not want the employees wearing masks because he did not want to scare the inmates or other employees. Warden LaRose also said that if they wore the masks in the housing units they would "shut us down." The USMS had not yet renewed their contract with Defendant.

104. On information and belief, AW Roemmich announced in a prior briefing that Defendant would not be providing masks to the Detention Officers because they were "over budget" and if they provided masks for the officers, they would have to provide them to detainees/inmates.

105. Warden LaRose and AM Roemmich were concerned about profits and the contracts with its customers over the safety of Plaintiff, his family, other employees and their families and the inmates/detainees.

106. Plaintiff continued to plead with them and reminded them that the facility was a closed society and COVID-19 would be coming in from outside. Plaintiff informed them that while there it was good there was an officer taking temperatures, just a small percentage of those infected had temperatures and many persons with COVID-19 were asymptomatic. Plaintiff also told them, "With all due respect, I think it is ridiculous that staff are not allowed to wear masks because we do not know who is infected in the facility, whether it be staff, inmate, or detainee population. I believe all staff should be wearing masks. Masks would protect us and the inmates and detainees," or words to that effect.

107. Shortly thereafter, Plaintiff learned that the employee who was infected with COVID-19 had worked on mid-shift (graveyard) in Central Control and had

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

handed out equipment to all of the employees on that shift. This could lead to the infection of each of the employees on that shift and in turn, to others they are in contact with. This was in direct contradiction to what Defendant had led reporters to believe, which was that the detainees/inmates were not exposed to COVID-19 because the infected Detention Officer did not have contact with them in their housing units.

108. By creating an unsafe work environment, Defendant essentially terminated Plaintiff's employment.

109. As of April 23, 2020, there were approximately 142 inmates/detainees and numerous of Defendant's staff who tested positive for COVID-19. This is not to account for the number of family members of Defendant's employees who have also tested positive.

110. Defendant intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the Plaintiff's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.

111. Because of the uncontrolled outbreak and transmission of COVID-19 at Defendant's facility, a County of San Diego COVID-19 task force is investigating and trying to help address the situation.

**FIRST CAUSE OF ACTION**

**WRONGFUL CONSTRUCTIVE TERMINATION**

**IN VIOLATION OF PUBLIC POLICY**

**[Cal. Labor Code §§ 6400 *et seq.*, 6401 *et seq.*]**

112. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

113. At all times relevant, Plaintiff was Defendant's employee.

114. California Labor Code §§ 6400 *et seq.* and 6401 *et seq.* were in full force and effect and were binding on Defendant.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

115. California Labor Code § 6407 requires that "[e]very employer and every employee shall comply with occupational safety and health standards, with Section 25910 of the Health and Safety Code, and with all rules, regulations, and orders pursuant to this division which are applicable to his own actions and conduct."

116. California Labor Code § 6400(a) requires an employer to provide a safe work environment for their employees.

117. California Labor Code § 6401 requires employers to "furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of the employees."

118. California Labor Code § 6306 provides that "safety device" and "safeguard" "shall be given a broad interpretation so as to include any practicable method of mitigating or preventing a specific danger."

119. California Labor Code § 6403 provides that "[n]o employer shall fail or neglect to do any of the following: (a) To provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe. (b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe. (c) To do every other thing reasonably necessary to protect the life, safety, and health of employees."

120. California Labor Code § 6404 provides that "[n]o employer shall occupy or maintain any place of employment that is not safe and healthful."

121. California Labor Code § 6406 provides that "[n]o person shall"

   a) Remove, displace, damage, destroy or carry off any safety device, safeguard, notice, or warning, furnished for use in any employment or place of employment.

b) Interfere in any way with the use thereof by any other person.

c) Interfere with the use of any method or process adopted for the protection of any employee, including himself, in such employment, or place of employment.

d) Fail or neglect to do every other thing reasonably necessary to protect the life, safety, and health of employees.

122. Defendant's conduct, as alleged herein, created an unsafe work environment.

123. Plaintiff complained about his safety concerns to Defendant.

124. Defendant intentionally created or knowingly permitted these working conditions.

125. Plaintiff feared for his health and safety.

126. Defendant constructively terminated Plaintiff's employment.

127. Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

128. Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of his employment with Defendant.

129. Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the State of California embodied in California Labor Code §§ 6400 *et seq.* and 6401 *et seq.*, in violation of California law pursuant to City of Moorpark v. Sup. Ct. (1998) 18 Cal.4th 1143.

130. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

131. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

132. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

## SECOND CAUSE OF ACTION

## WRONGFUL CONSTRUCTIVE TERMINATION

## IN VIOLATION OF PUBLIC POLICY

## [Cal. Code Regs. Tit. 8, §§ 5141, 3380]

133. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

134. At all times relevant, Plaintiff was Defendant's employee.

135. The California Code of Regulations Title 8 of the California Occupational Safety and Health Regulations (Cal/OSHA) was in full force and effect and was binding on Defendant.

136. Title 8 section 3380 requires employers to conduct a hazard assessment to determine if hazards are present or are likely to be present in the workplace that necessitate the use of Personal Protective Equipment (PPE). If such hazards are present, or likely to be present, the employer is required to select and provide affected employees with properly fitting PPE that would effectively protect employees.

137. COVID-19 was a hazard that was present, or likely to be present, in Defendant's workplace that necessitated the use of PPE.

138. Title 8 section 5141 requires employers to protect employees from harmful exposures (as defined by section 5140, which includes an exposure to fumes,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

mists, vapors or gases by inhalation that results in or has the probability to result in injury, illness, disease, impairment or loss of function). This provision requires employers to implement engineering controls where feasible and administrative controls where practicable, or provide respiratory protection where engineering and administrative controls cannot protect employees and during emergencies.

139.   COVID-19 was a harmful exposure at Defendant's workplace.

140.   Defendant's conduct, as alleged herein, created an unsafe work environment.

141.   Plaintiff complained about his safety concerns to Defendant.

142.   Defendant intentionally created or knowingly permitted these working conditions.

143.   Plaintiff feared for his health and safety.

144.   Defendant constructively terminated Plaintiff's employment.

145.   Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

146.   Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of his employment with Defendant.

147.   Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the State of California embodied in the California Code of Regulations Title 8 of the California Occupational Safety and Health Regulations (Cal/OSHA), in violation of California law pursuant to Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66.

148.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

149.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

150.  As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

## THIRD CAUSE OF ACTION
## WRONGFUL CONSTRUCTIVE TERMINATION
## IN VIOLATION OF PUBLIC POLICY
## [29 USC 654(a)(1)]

151.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

152.  At all times relevant, Plaintiff was Defendant's employee.

153.  The Federal Occupational Safety and Health Act (OSHA) of 1970 was in full force and effect and was binding on Defendant.

154.  The General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health Act (OSHA) of 1970, 29 USC 654(a)(1), which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm."

155.  Defendant failed to thoroughly explore all options to comply with OSHA standards.

156.  COVID-19 was a hazard that caused or was likely to cause death or serious physical harm in Defendant's workplace.

157. Defendant's conduct, as alleged herein, created an unsafe work environment.

158. Plaintiff complained about his safety concerns to Defendant.

159. Defendant intentionally created or knowingly permitted these working conditions.

160. Plaintiff feared for his health and safety.

161. Defendant constructively terminated Plaintiff's employment.

162. Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

163. Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of his employment with Defendant.

164. Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the United States embodied in the General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health Act (OSHA) of 1970 in violation of California law pursuant to Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66.3.

165. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

166. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

167. As a result of Defendants' deliberate, outrageous, despicable conduct,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

**FOURTH CAUSE OF ACTION**

**WRONGFUL CONSTRUCTIVE TERMINATION**

**IN VIOLATION OF PUBLIC POLICY**

**[29 C.F.R. § 1910.132]**

168. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

169. At all times relevant, Plaintiff was Defendant's employee.

170. The Code of Federal Regulations Title 29 of the Occupational Safety and Health Standards (OSHA) was in full force and effect and was binding on Defendant.

171. Title 29 section 1910.132 requires employers to conduct a hazard assessment to determine if hazards are present or are likely to be present in the workplace that necessitate the use of Personal Protective Equipment (PPE). If such hazards are present, or likely to be present, the employer is required to select and have each affected employee use PPE that will protect the employee from such hazards, communicate selection decisions and select the PPE that properly fits each affected employee.

172. Title 29 section 1910.132 further requires employers to provide protective equipment, "including personal protective equipment for eyes, face, head and extremities, protective clothing, respiratory devices, and protective shields and barriers", "wherever it is necessary by reason of hazards of processes or environment" "encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact."

173. COVID-19 was a hazard that was present, or likely to be present, in

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1    Defendant's workplace that necessitated the use of PPE.

2    174.  Defendant's conduct, as alleged herein, created an unsafe work environment.

3    175.  Plaintiff complained about his safety concerns to Defendant.

4    176.  Defendant intentionally created or knowingly permitted these working

5          conditions.

6    177.  Plaintiff feared for his health and safety.

7    178.  Defendant constructively terminated Plaintiff's employment.

8    179.  Such actions are unlawful, in violation of public policy of the State of

9          California, and have resulted in damage and injury to Plaintiff, as alleged

10         herein.

11   180.  Plaintiff believes and thereon alleges that Defendant's failure to provide a

12         safe work environment was a substantial motivating reason for Defendant's

13         constructive termination of his employment with Defendant.

14   181.  Defendants' constructive termination of Plaintiff's employment on the basis

15         of its failure to provide a safe work environment violated the public policy

16         of the United States embodied in the Code of Federal Regulations Title 29 of

17         the Occupational Safety and Health Standards (OSHA), in violation of

18         California law pursuant to Green v. Ralee Engineering Co. (1998) 19 Cal.4th

19         66.

20   182.  As a direct, foreseeable, and proximate result of Defendants' conduct,

21         Plaintiff has sustained and continues to sustain substantial losses in earnings,

22         employment benefits, employment opportunities, and Plaintiff has suffered

23         other economic losses in an amount to be determined at time of trial.

24         Plaintiff has sought to mitigate these damages.

25   183.  As a direct, foreseeable, and proximate result of Defendants' conduct,

26         Plaintiff has suffered and continues to suffer humiliation, emotional distress,

27         loss of reputation, and mental and physical pain and anguish, all to his

28         damage in a sum to be established according to proof.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101

184.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

## FIFTH CAUSE OF ACTION

## NEGLIGENT SUPERVISION

185.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

186.   Defendants' supervisory employees failed to provide a safe work environment in violation of California and federal law.

187.   Defendants knew or should have known that this conduct was unlawful and in violation of California law.

188.   Defendant constructively terminated Plaintiff's employment.

189.   Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

190.   Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of his employment with Defendant.

191.   Defendants failed to take steps necessary to prevent the unlawful conduct described herein.

192.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

193.   As a direct, foreseeable, and proximate result of Defendants' conduct,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

## SIXTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

194. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

195. Defendants' intentional conduct, as set forth herein, was extreme and outrageous.

196. Defendants intended to cause Plaintiff to suffer extreme emotional distress. Plaintiff suffered extreme emotional distress.

197. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to Plaintiff's damage in an amount according to proof at trial.

///
///
///
///
///
///
///
///
///
///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1   **WHEREFORE**, Plaintiff prays for the following relief:

2      1.      For compensatory damages, including back pay, front pay, and other

3              monetary relief, in an amount according to proof;

4      2.      For special damages in an amount according to proof;

5      3.      For mental and emotional distress damages;

6      4.      For punitive damages in an amount necessary to make an example of

7              and to punish defendants, and to deter future similar misconduct;

8      5.      For costs of suit, including attorneys' fees as permitted by law,

9              including those permitted by California Code of Civil Procedure

10             section 1021.5;

11     6.      For an award of interest, including prejudgment interest, at the legal

12             rate as permitted by law;

13     7.      For injunctive relief;

14     8.      For such other and further relief as the Court deems proper and just

15             under all the circumstances.

16

17  **PLAINTIFF GREGORY ARNOLD** demands a jury trial on all issues in this

18  case.

19

20  DATED: April 29, 2020            **GRUENBERG LAW**

21

22                                   _____

23                                   JOSH D. GRUENBERG, ESQ.

24                                   COLETTE N. MAHON, ESQ.
                                     Attorneys for Plaintiff,
25                                   **GREGORY ARNOLD**

26

27

28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101