UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARITA SMITH,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CORECIVIC OF TENNESSEE, LLC, and DOES 1–25,<br><br>　　　　　　Defendants. | Case No.: 20-cv-0808-L-DEB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 45]** |
| GREGORY ARNOLD,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CORECIVIC OF TENNESSEE, LLC, and DOES 1–25,<br><br>　　　　　　Defendants. | Case No.: 20-cv-0809-L-DEB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| ERICA BROOKS,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CORECIVIC OF TENNESSEE, LLC, and DOES 1–25,<br><br>　　　　　　Defendants. | Case No.: 20-cv-0994-L-DEB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is Defendant CoreCivic of Tennessee, LLC's ("Defendant") omnibus motion for summary judgment. (ECF No. 45.) Plaintiffs Margarita Smith, Gregory Arnold, and Erica Brooks (collectively, "Plaintiffs") filed an omnibus opposition, (ECF No. 46), and Defendant replied, (ECF No. 49). The Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Court decides the matter on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). For the reasons stated below, Defendant's motion for summary judgment is granted.

## I. INTRODUCTION

The Otay Mesa Detention Center ("OMDC") is a detention facility in San Diego, California that is owned and operated by Defendant. (ECF No. 49-1, at 3.)[1] Defendant has continuously operated OMDC from the beginning of the COVID-19 pandemic in January, 2020 to the present. (*Id.* at 5.) Plaintiffs worked at OMDC in early 2020. (*Id.* at 21–36.) Plaintiffs all resigned from their positions at OMDC in Spring of 2020. (*Id.*) Each Plaintiff filed an individual action against Defendant claiming constructive discharge in violation of four state and federal public policies due to Defendant's failure to adequately implement sufficient measures to mitigate the anticipated spread of COVID-19. (20-cv-0808, ECF No. 1; 20-cv-0809, ECF No. 1; 20-cv-0994, ECF No. 1.) Plaintiffs also brought claims for negligent supervision and intentional infliction of emotional distress that were independently dismissed. (20-cv-0808, ECF No. 10; 20-cv-0809, ECF No. 9; 20-cv-0994, ECF No. 9.) In March of 2021, case numbers 20-cv-809 and 20-cv-994 were transferred to the docket of Judge Lorenz pursuant to the Low-Number Rule. (20-cv-809, ECF No. 17; 20-cv-994, ECF No. 20.) Defendant now moves for summary judgment of all Plaintiffs' remaining claims for constructive discharge.

---

[1] Unless otherwise stated, all citations to electronically filed documents refer to documents filed on the docket in case number 20-cv-0808. All facts are derived from the parties' joint statement of undisputed material facts. (ECF No. 49-1.)

## II. FACTUAL BACKGROUND[2]

### A. Defendant's COVID Response

As the parties are well aware, the COVID-19 outbreak captivated public attention as early as January 2020. (ECF No. 49-1, at 16.) In February 2020, Defendant issued an initial Pandemic Coronavirus Plan. (*Id.* at 6.) By March 2020 Defendant began taking additional measures to address the spread of COVID-19 such as providing OMDC with educational signage regarding COVID-19 symptoms, handwashing, sanitation and cleanliness, mask use, social distancing, and steps to reduce the risk of exposure. (*Id.* at 9.) Despite these measures, employees at OMDC were generally prohibited from wearing masks in March 2020. (*See id.* at 15–16.)

On March 20, 2020, OMDC required screening at the front lobby for all persons entering the facility, but screening staff were not allowed to wear full personal protective equipment ("PPE") until they were required to do so on March 27. (*Id.* at 11, 15.) Also beginning March 20, Defendant allowed employees to wear facemasks in the presence of a symptomatic person. (*Id.* at 14.) Masks were required for staff working in a protective cohort or quarantine pod by the third week of March. (*Id.* at 15.) On March 23, the OMDC began serving meals to one housing unit at a time in the dining hall and encouraging detainees to limit seating to three people per table. (*Id.* at 12.) The OMDC also instructed staff to limit the number of individuals in the sallyport to fifteen. (*Id.* at 12.) Effective the next day employees were no longer required to use a fingerprint when clocking in. (*Id.* at 11.)

On March 30, 2020, OMDC informed staff that "Control Center is sanitizing radios and equipment as an additional precaution" and that staff "should still ensure equipment and areas are sanitized when possible." (*Id.* at 13.) OMDC set up a phone information

---

[2] All objections to evidence not relied upon by the Court are overruled.

system to allow staff to receive shift briefings via phone instead of in-person and banned close-contact training on the same day. (*Id.*)

Beginning April 3, 2020, all OMDC employees and staff were allowed to wear a facemask in the facility. (*Id.* at 16.) Detainees were offered masks on April 10 at no cost. (*Id.*) OMDC's warden sent an email to all staff on April 20 recommending they wear masks, and the use of masks became mandatory for all OMDC employees on April 28. (*Id.*)

### B. Margarita Smith

Defendant Margarita Smith was hired by Defendant as a Detention Officer at a different facility on April 13, 2009. (*Id.* at 32.) When Smith's facility was closed she was transferred to OMDC and eventually promoted to the position of Senior Detention Officer in 2016. (*Id.*) Smith took a leave of absence due to personal illness from February 28, 2020, to March 9, 2020. (*Id.* at 33.) During a March 17, 2020 briefing at OMDC, Smith and her coworkers expressed concerns about how long rags could be used before they should be washed, and Smith's coworkers requested gloves and disinfectant wipes to help combat the virus. (*Id.*) At the direction of her doctor Smith took another leave of absence on March 17, 2020, that was expected to end on March 31, 2020. (*Id.*) Smith decided to resign on March 31, 2020 and did so that same day. (*Id.* at 34.)

Following Smith's resignation she spoke with the assistant warden at OMDC who asked Smith to delay her decision to resign "because it would all blow over in a month." (*Id.* at 35.) Smith never returned to work at OMDC but was aware that the OMDC human resources manager attempted to reach out to her to discuss extending Smith's leave of absence. (*Id.*) Smith testified that she did not attempt to determine what measures had been taken at OMDC to address COVID-19 since she began leave and she did not know when Defendant began allowing employees at OMDC to wear masks. (*Id.* at 34–35.)

### C. Gregory Arnold

Defendant Gregory Arnold started working as a Detention Officer at OMDC on November 13, 2018. (*Id.* at 26.) Arnold lives with his asthmatic son. (*Id.*) On March 30,

2020, Arnold sent an email to the OMDC warden suggesting that all OMDC staff wear protective gloves and masks given that PPE recommendations might change and that there was a rapidly-spreading outbreak at a facility in New York. (*Id*. at 27.) The warden responded the same day explaining that OMDC was following CDC guidelines. (*Id*.)

On April 1, 2020, Arnold's request to wear a facemask while working that day was denied because he was not required to work with COVID-positive, COVID-positive-suspected, or high-risk detainees. (*Id.* at 28.) Arnold believed that his family was considered high-risk and testified that he refused to work if he could not wear a mask. (*Id.*) Defendant offered Arnold a Family and Medical Leave Act ("FMLA") leave of absence, but he refused. (*Id.*) Arnold was then told that he was "not willing to go to post" which he believed was a terminable offense. (*Id.* at 28–29.)

Arnold went on FMLA leave beginning April 1, 2020. (*Id.* at 29.) Arnold testified that the only reason he did not work on April 1 was because he was told that he could not wear a mask, and that he would have worked if he was allowed to wear one. (*Id*.) He initially requested FMLA leave for the period of April 7, 2020, to May 1, 2020, which was approved and then extended through May 15, 2020. (*Id.*) Arnold resigned on May 19, 2020. (*Id.* at 30.) He did not consider resigning until the end of April 2020 and was unaware at the time of his resignation of whether Defendant was allowing employees at OMDC to wear masks. (*Id.* at 31.)

   D.   **Erica Brooks**

Defendant Erica Brooks began working at OMDC on August 20, 2018, in the position of Master Scheduler but began working as a Detention Officer about one year later. (*Id.* at 21.) On March 30, 2020, Brooks began FMLA leave. (*Id.* at 22.) Brooks's leave was approved for the period of March 30, 2020, to May 12, 2020. (*Id.*) In a March 30, 2020 email from Brooks to OMDC's human resources manager, Brooks described an incident where she was told she was not allowed to wear a face mask while guarding a detainee with suspected tuberculosis despite being advised to wear a mask by a nurse. (*Id.* at 23.) Brooks resigned on May 12, 2020. (*Id.*) Brooks did not think about resigning

before May 2020 and was not present at OMDC any time between when her leave began and when she resigned. (*Id.* at 25.) Brooks was unaware that all employees were allowed to wear facemasks at OMDC beginning April 3, 2020. (*Id.* at 26.)

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where the record, taken in the light most favorable to the nonmoving party, demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "material" fact is one "that might affect the outcome of the case," and an issue of material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party can carry its burden of production by either (1) presenting evidence that negates an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Id.* If the moving party fails to discharge this initial burden, the nonmoving party may defeat summary judgment without producing anything. *Id.* at 1102–03.

If, however, the moving party meets their initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings"

and designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). The Court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 12705, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

### B.  Constructive Termination

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1025 (Cal. 1994). "[A]n employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Id.* at 1029. To amount to constructive discharge, working conditions must be "unusually 'aggravated' or amount to a 'continuous pattern.'" *Id.* at 1027.[3]

"[A]n employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood." *Turner*, 876 P.2d at 1026. The determination of whether conditions were so intolerable to justify a reasonable employee's decision to resign is normally a factual question for the jury. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987). "[H]owever, summary judgment against an

---

[3] California law also requires the employee to prove that the dismissal violated a public policy. *Turner*, 876 P.2d at 1032–33. Defendant only challenges Plaintiffs' ability to show constructive termination, (ECF No. 45-1, at 31), thus the Court need not address the public policy element.

employee on a constructive discharge claim is appropriate when, under the undisputed facts, the decision to resign was unreasonable as a matter of law." *Scotch v. Art Inst. of California*, 93 Cal. Rptr. 3d 338, 368 (Ct. App. 2009). "The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." *Turner*, 876 P.2d at 1026.

## IV.   DISCUSSION

As an initial matter, Plaintiffs argue that they were forced to take leave due to insufficient safety measures taken at OMDC, and therefore they were constructively discharged at the time they went on leave. (ECF No. 48, at 29–30.) But the law has long required that an employee claiming constructive discharge establish intolerable working conditions *at the time of the employee's resignation*. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994); *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999); *King v. AC & R Advert.*, 65 F.3d 764, 767 (9th Cir. 1995); *Turner*, 876 P.2d at 1029; *Garamendi v. Golden Eagle Ins. Co.*, 27 Cal. Rptr. 3d 239, 254 (Ct. App. 2005).

While the court recognizes that a leave of absence may give rise to a claim for constructive discharge in lieu of a resignation, here each Plaintiff actually resigned and there is no evidence that Plaintiffs intended to "*permanently* 'leave' [their] employment" at the time they each took leave. *Sanchez v. Loews Hotels Holding Corp.*, No. 19-cv-02084-W-MDD, 2021 WL 424288, at *5 (S.D. Cal. Feb. 8, 2021) (emphasis added). None of the Plaintiffs contemplated resigning until very near to or on the date they resigned. Accordingly, the Court looks to evidence of intolerable conditions at the time Plaintiffs resigned, not when Plaintiffs went on leave.[4]

Defendant argues *inter alia* that because Plaintiffs were not working and had no knowledge of the COVID protocols Defendant had in place at the time of their resignations,

---

[4] It follows that any factual disputes raised by Plaintiffs' evidence concerning the conditions before the times Plaintiffs resigned are immaterial.

Plaintiffs cannot possibly establish that they were subject to intolerable working conditions at the time they resigned. (ECF No. 45-1, at 36.)

Plaintiffs respond that Defendant's repeated lack of safety measures in light of an ongoing global pandemic and repeated refusal to ensure the problems were corrected renders the working conditions unusually adverse. (ECF No. 48, at 32.) Plaintiffs argue specifically that Defendant refused to take any additional sanitation precautions or provide adequate sanitation supplies. (*Id.* at 32–33.) Additionally, Plaintiffs assert that Defendant "doubled-down" on prohibiting masks for Plaintiffs, despite their known underlying health conditions. (*Id.* at 34.) This fact, coupled with Defendant's repeated indifference to the risk of transmission, renders the circumstances unusually adverse according to Plaintiffs. (*Id.*)

Plaintiffs add that OMDC has dealt with outbreaks in the past, and Defendant continuously failed to take affirmative steps to minimize a potential outbreak. (*Id.* at 34–35.) Plaintiffs contend that Defendants did not take steps to ensure all precautions were actually implemented such as failing to designate any individual to ensure increased sanitation processes were in place after repeated employee complaints. (*Id.* at 35.) These issues occurred prior to the onset of the COVID-19 pandemic and were exacerbated by its onset, Plaintiffs argue. (*Id.*)

The Court finds that Defendants met their initial burden by showing that Plaintiffs lack sufficient evidence to prove they were subject to intolerable conditions at the time they resigned. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("Under the federal standard a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's claim."). The burden then shifts to Plaintiffs to demonstrate a genuine dispute of material fact.

To start, Plaintiffs do not provide any evidence of the working conditions at OMDC in May of 2020, when Brooks and Arnold resigned. In fact, the only evidence of the working conditions after April 1, 2020, the last day that any of the Plaintiffs worked at

OMDC, is set forth by Defendant. Such evidence shows that Defendant continued to take additional safety measures in April of 2020, namely requiring its staff to wear masks. (*See* ECF No. 49-1, at 16.) Without presenting any evidence of the actual working conditions at OMDC in May 2020, Arnold and Brooks cannot meet their burden to overcome summary judgment. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) ("To avoid summary judgment, [the plaintiff] was required to present significant probative evidence tending to support her allegations." (quotations omitted)).

The Court also finds that the evidence to which Plaintiffs cite is insufficient to create a dispute of a material fact as to whether the working conditions were intolerable when Smith resigned on March 31, 2020. For example, Plaintiffs cite to over fifty pages of OMDC shift activity reports to support their assertion that Defendants "refused to take all reasonable measures to ensure the [safety] problems were corrected." (*See* ECF No. 48, at 32.) The shift reports show that between March 20, 2020, and March 30, 2020, OMDC started requiring staff to submit to temperature checks; limiting meals to only one pod in the chow hall at a time and encouraging only three people per table; questioning staff at the entry about possible COVID symptoms and exposure; requiring PPE for visitors, officers working in pods of vulnerable populations, and screening staff; and putting in place social distancing and sanitization procedures. (ECF No. 46-5, at 39, 44, 45, 49, 50.) The shift reports do not suggest a lack of action, but instead do the opposite by showing that Defendant progressively adopted additional safety measures. Plaintiffs cite to these shift reports on multiple occasions to support their various arguments that Defendant was aware of a high risk and failed to take the appropriate measures, but do not explain how this evidence supports their arguments. (*See* ECF No. 48, at 33, 35.)

Plaintiffs also cite to over ninety pages of meeting minutes from Defendant's Coronavirus Committee to demonstrate that Defendant created special precautions to protect high-risk detainees but failed to do the same for staff, and that facility leaders needed to communicate the COVID-19 policies better. (*Id.* at 33, 35.) The meeting minutes echo the shift reports in detailing Defendant's ongoing efforts to ramp up their

safety policies. Between March 24, 2020, and March 31, 2020, the committee discussed implementing staff screening; signage pertaining to COVID practices; social distancing; PPE requirements when interacting with confirmed or suspected COVID patients; and sanitation procedures. (*See* ECF No. 46-6, at 16–17, 21, 22, 23, 28, 29, 39.)

Plaintiffs' efforts to use evidence in the record to prove a negative, i.e. a lack of safety measures, fall short of creating a genuine dispute of material fact. The shift reports and meeting minutes do not provide affirmative evidence of intolerable conditions at the time Plaintiffs resigned. To be sure, any evidence that only shows which policies were put in place but do not illustrate the actual working conditions are insufficient to raise a genuine dispute of material fact. (*See, e.g.*, ECF No. 48, at 19.)

Plaintiffs provide scant evidence of the working conditions at the time of Smith's resignation including Arnold's testimony that he saw screening staff not wearing the full PPE on March 31, 2020, and testimony from Brooks and Arnold that they were in close proximity to their coworkers during that time. (*See* ECF No. 49-1, at 15; ECF No. 46-4, at 71; *id.* at 90.) Plaintiffs also cite elsewhere to Arnold and Brooks's declarations and Brooks's deposition transcript in which they state that the check-in kiosks were not regularly cleaned. (ECF No. 46-4, at 73; *id.* at 90; ECF No. 46-3, at 160.) A reasonable jury could not return a verdict for Plaintiffs based on these facts alone and thus a genuine dispute of material fact does not exist. *Triton Energy Corp.*, 68 F.3d at 1221 ("[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor.").

In sum, whether the safety measures mentioned were actually implemented or enforced could give rise to a genuine dispute of material fact, but Plaintiffs do not point to any evidence suggesting that Defendant's actions did not align with its stated policies. Plaintiffs have failed to demonstrate a genuine dispute as to whether the working conditions at OMDC were intolerable at the time of their resignations due to Defendant's COVID policies or lack thereof. *See Steiner*, 25 F.3d at 1465–66 (affirming grant of summary judgment in defendant's favor on constructive discharge claim where defendant company

took steps to remedy conditions before the plaintiff eventually resigned months later); *Montero*, 192 F.3d at 861 (holding the same).[5]

Further, Plaintiffs assert that Defendant cannot escape liability by claiming that it followed CDC recommendations. (ECF No. 48, at 23–27.) Failure to follow CDC guidelines by itself cannot render the working conditions intolerable. *Cf. Turner*, 876 P.2d at 1032 ("The mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee."). Plaintiffs have failed to raise a genuine dispute of material fact as to intolerable conditions otherwise. Thus, assuming arguendo that Defendant did not comply with CDC recommendations, Plaintiffs cannot overcome summary judgment because they failed to raise a genuine dispute of material fact.[6]

Plaintiffs also argue that even if Defendant implemented safety guidelines, they were implemented too late. (ECF No. 48, at 26.) Plaintiffs claim that Defendant failed to timely social distance briefing sessions, the intake unit, and the chow hall as well as provide recommended PPE to intake personnel. (*Id.*) Additionally, Plaintiffs assert Defendant did not ensure adequate sanitation which included failing to disinfect the control center equipment and check-in kiosks until after discovering the OMDC's first COVID-positive staff member. (*Id.*)

The evidence Plaintiffs cite to in support of their timeliness contention suffers from the same deficiencies previously noted by the Court. Plaintiffs rely on evidence that confirms the dates Defendant put in place certain safety measures such as the shift activity reports discussed above, (ECF No. 46-5, at 1–53; ECF No. 45-3, at 231; ECF No. 45-11, at 77), an email from Defendant's vice president concerning best practices for social

---

[5] While *Steiner* and *Montero* involve harassment claims under Title VII, both cases employ the same standard for constructive discharge applicable here. *See Steiner*, 25 F.3d at 1465; *Montero*, 192 F.3d at 861.

[6] Plaintiffs' arguments concerning the length of time they were subject to the alleged intolerable conditions and whether Defendant knowingly permitted such conditions to exist are immaterial for the same reason. (*See* ECF No. 48, at 36–41.)

distancing wardens and assistant wardens, (ECF No. 46-7, at 13), and an email discussing the implementation of PPE requirements for screening staff on March 27, 2020, (ECF No. 45-12, at 155).  This evidence does nothing more than contribute to the factual timeline of Defendant's COVID policies and does not demonstrate to the Court why such policies were untimely.

The only evidence that Plaintiffs cite to that alludes to a timeliness issue is the deposition transcript of OMDC's warden in which he acknowledges receiving an email of an unspecified date advising him that he "should" take certain measures laid out in a "Coronavirus prevention plan."  (ECF No. 46-2, at 75.)  This evidence is plainly insufficient to raise a genuine dispute of material fact as to the timing of Defendant's COVID response.  Notably absent is any indication of when the email was sent, whether the warden implemented the recommendations and if so, when they were implemented, and what made the circumstances untimely.  Plaintiffs are again unable to carry their burden to avoid summary judgment.

## V.   CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs failed to raise a genuine dispute of material fact with respect to whether their working conditions were sufficiently intolerable to constitute constructive discharge, and Defendant is therefore entitled to judgment as a matter of law.  Accordingly, Defendant's motion for summary judgment is **GRANTED**.  **The clerk is instructed to enter judgment in Defendant's favor and close the above-captioned actions**.

IT IS SO ORDERED.

Dated:  May 4, 2023

Hon. M. James Lorenz
United States District Judge